IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-02961-PAB-SBP

KATHERINE and FRANK RICHARDSON,

    Plaintiffs,

v.

AMICA MUTUAL INSURANCE COMPANY, a corporation,

    Defendant.

---

# ORDER

---

This matter comes before the Court on Defendant's Rule 12(b)(6) Motion to Dismiss [Docket No. 14]. Plaintiffs responded to the motion, Docket No. 16, and defendant replied. Docket No. 22. The Court has jurisdiction under 28 U.S.C. § 1332.

## I. BACKGROUND[1]

Plaintiffs Katherine Richardson and Frank Richardson initiated this action against Amica Mutual Insurance Company ("Amica") in the district court for Boulder County, Colorado, on October 24, 2022. Docket No. 6 at 1. Amica removed the case to this Court on November 15, 2022. Docket No. 1.

Plaintiffs own two homes, one located in Iowa ("Iowa Home") and one located in Louisville, Colorado ("Louisville Home"). Docket No. 6 at 1, ¶¶ 1-2. Amica issued a separate insurance policy covering each home. *Id.* at 2-3, ¶¶ 11-12. The Louisville

---

[1] The following facts are taken from plaintiffs' Complaint and Jury Demand, Docket No. 6, and are assumed to be true for purposes of this order. *See Brown v. Montoya,* 662 F.3d 1152, 1162 (10th Cir. 2011).

Home was plaintiffs' primary residence until May 2018 and was covered by an Amica Homeowners Policy until that time. *Id.* at 3, ¶¶ 13-14. Amica Homeowners Policies include standard coverages for a primary residence, including dwelling, contents coverage, automatic inflation adjustment to policy limits, and additional coverage beyond those included in Amica Dwelling Policies. *Id.*, ¶ 18.

In May 2018, plaintiffs notified Amica that the Iowa Home had become their primary residence and that the Louisville Home was to be a rental property. *Id.*, ¶ 15. In response, Amica issued a Homeowners Policy for the Iowa Home and a Dwelling Policy for the Louisville Home. *Id.*, ¶ 16. The Dwelling Policy that Amica issued for the Louisville Home did not include contents coverage or automatic adjustment to policy limits. *Id.*, ¶ 19. Amica did not notify plaintiffs that anything was needed to change the Louisville Home from a primary residence to a rental property for insurance purposes. *Id.*, ¶ 17. Amica underwrote and issued a Dwelling Policy for the Louisville Home in 2018 without the direction of plaintiffs. *Id.*, ¶ 20. Amica did not notify plaintiffs that it had changed the insurance on the Louisville Home from a Homeowners Policy to a Dwelling Policy, although plaintiffs "knew that Amica was changing something about their Louisville Home's coverage to reflect its status as a rental property." *Id.* at 3-4, ¶¶ 22-23. Because Amica changed the coverage of the Louisville Home "automatically and without requiring anything more than notice of Plaintiff's change in primary residence," plaintiffs believed that Amica "could restore the Louisville Home's previous coverage in the same manner with notice of change in primary residence." *Id.* at 4, ¶ 23.

In May 2021, Katherine Richardson informed Amica that plaintiffs would be moving back into the Louisville Home in August 2021, with the result that the Louisville Home would be their primary residence and the Iowa Home would become a vacation or secondary home. *Id.*, ¶ 26. In response, Amica "told Plaintiffs to just call and let Amica know when they were back in Colorado." *Id.*, ¶ 27. In August 2021, Katherine Richardson informed Amica that plaintiffs were moving into the Louisville Home and had contracted to install an ADT fire and security system there. *Id.*, ¶ 28. The installation of the ADT system made the Louisville Home eligible for a Premises Alarm or Fire Protection System endorsement, but Amica applied the endorsement to the policy covering the Iowa Home instead. *Id.* at 5, ¶ 31.

In September 2021, Matthew Sweeney, a licensed insurance producer for Amica, engaged Castle High Value Surveys ("Castle") to evaluate the Louisville Home to estimate the replacement cost value ("RCV") of the structure. *Id.*, ¶ 33. This evaluation was necessary to replace the Dwelling Policy on the Louisville Home with a homeowner's policy. *Id.* at 5-6, ¶¶ 37-38. Castle "reached out to Plaintiffs with an insurance survey that was presented as being necessary to confirm current insurance coverage on the Louisville Home." *Id.* at 5, ¶ 34. Plaintiffs indicated on the survey that the home would be a primary residence. *Id.* Castle produced a report estimating that the RCV for the Louisville Home was $913,167.00, and on September 20, 2021, Sweeney forwarded the report to plaintiffs. *Id.*, ¶¶ 35-36.

Amica did not inform plaintiffs that the Dwelling Policy was no longer appropriate for the Louisville Home after the Louisville Home became plaintiffs' primary residence. *Id.*, ¶ 36. Amica did not inform plaintiffs that it had requested the Castle evaluation for

3

the purpose of replacing the Louisville Home's Dwelling Policy with a Homeowners Policy. *Id.*, ¶ 37. Amica also did not inform plaintiffs that it would need to write an entirely new policy for the Louisville Home or that Amica would have to approve Castle's RCV estimate before it would proceed with insuring the Louisville Home as a primary residence. *Id.* at 6, ¶¶ 38-39. Amica did not follow up with plaintiffs or request additional information or approval to increase coverage on the Louisville Home for at least three months. *Id.*, ¶ 40.

On December 30, 2021, the Marshall Fire destroyed the Louisville Home and its contents. *Id.*, ¶ 41. The next day, Amica advised plaintiffs through a telephone call that it would send a check for "necessary expenses," but informed plaintiffs an hour later that the previous telephone call had been a mistake because Amica had been under the impression that it was the Iowa Home that had burned to the ground. *Id.*, ¶¶ 42-43. Amica informed plaintiffs that there was no coverage available for necessary expenses and that it could advance at most 10% of the personal property coverage limits under the Iowa Home Homeowners Policy. *Id.*, ¶ 44.

In January 2022, the Federal Emergency Management Agency informed plaintiffs that they did not qualify for relief after the fire because the Louisville Home's insurance policy indicated that it was not a primary residence. *Id.*, ¶ 45. Amica agreed to amend the occupancy status on the Louisville Home's policy effective October 2021, but refused to alter the coverage on the policy. *Id.*, ¶ 46. Plaintiffs later learned that Amica had not made substantive changes to the Louisville Home's policy and had only removed the Iowa Home as the mailing address on the policy's declarations page. *Id.* at 7, ¶ 47. In March 2022, Amica continued to issue documents for the Iowa Home that

4

stated that the Louisville Home was a rental property. *Id.*, ¶ 49. In communications with plaintiffs, Amica stated that "our Denver branch was working toward writing a Homeowners Policy for you at the Colorado location" and that "it appears Denver did not tell us of this change." *Id.*, ¶¶ 50-51. At the time the action was filed, Amica continued to refuse to retroactively change the Louisville Home policy from a Dwelling Policy to a Homeowners Policy. *Id.*, ¶ 52.

Plaintiffs bring three[2] claims against Amica: (1) negligence in failing to procure insurance coverage; (2) breach of the implied duty of good faith and fair dealing; and (3) reformation of insurance policy. *Id.* at 7-13, ¶¶ 54-70, 76-103. Amica seeks to dismiss plaintiffs' claims for negligence and breach of the implied duty of good faith and fair dealing. Docket No. 14 at 2.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Id.* at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."

---

[2] Plaintiffs' complaint also alleges a claim for respondeat superior for employees' negligence. Docket No. 6 at 9-10, ¶¶ 71-75. However, plaintiffs do not oppose the dismissal of this claim. Docket No. 16 at 12.

*Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alterations omitted). An affirmative defense, such as the statute of limitations, may be considered on a motion to dismiss under Rule 12(b)(6) only when a plaintiff admits every element of the affirmative defense in the complaint. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

## III. ANALYSIS

The parties did not file a copy of the insurance policy covering the Louisville Home and no party stated whether the policy included a choice of law provision applicable to this action. The parties appear to agree that Colorado law applies to the claims in this case. The Court will operate under the same premise. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

### A. Negligence

"[T]he initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury." *HealthONE v. Rodriguez ex rel. Rodriguez,* 50 P.3d 879, 888 (Colo. 2002). "A negligence claim must fail if based on circumstances for which the law imposes no duty of care upon the defendant for the benefit of the plaintiff." *Univ. of Denver v. Whitlock*, 744 P.2d 54, 56 (Colo. 1987). Amica argues that plaintiffs' negligence claim fails because Amica "did not owe Plaintiffs any duty to secure contents coverage or issue a Homeowners Policy with modified coverage on the Louisville Residence." Docket No. 14 at 5.

An insurance company generally "does not have a common law duty to ensure complete protection to the policyholder or to recommend higher policy limits." *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 259 (Colo. App. 2009) (citing *Kaercher v. Sater,* 155 P.3d 437, 440-41 (Colo. App. 2006)).  However, such a duty may arise if there is a "special relationship" between the insured and an insurance agent.[3]  *Kaercher,* 155 P.3d at 441.  Plaintiffs offer two theories supporting their argument that Amica is liable for negligence because it had a special relationship with plaintiffs.  Docket No. 16 at 8-12.

First, plaintiffs claim that "a 'special relationship' arose when defendant undertook and agreed to procure homeowners coverage for their Louisville Home." Docket No. 16 at 11.  In Colorado, "an insurance broker . . . who agrees to obtain a particular form of insurance coverage for the person seeking such insurance has a legal duty to obtain such coverage or to notify the person of his failure or inability to do so." *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.,* 739 P.2d 239, 243 (Colo. 1987); *see also Cooley v. American Family Mut. Ins. Co.,* No. 08-cv-01041-WYD-MEH, 2008 WL 4821208, at *3 (D. Colo. Nov. 3, 2008) ("an [insurance] agent could be liable where he was specifically requested to procure a particular type of benefits and indicated that he would do so and did not") (applying Colorado law).

However, the complaint contains no allegation that plaintiffs requested Amica to procure homeowners coverage for their Louisville Home after moving back into it and no

---

[3] A claim for negligence may be maintained directly against an insurance company where no insurance broker is involved.  *Terry v. Avemco Ins. Co.*, 663 F. Supp. 39, 42 (D. Colo. 1987) (applying Colorado law).  Plaintiffs allege that Amica does not use dedicated agents or brokers.  Docket No. 6 at 7, ¶ 53.  Accordingly, plaintiffs may bring this claim against Amica directly.

allegation that Amica agreed to procure such coverage.  Rather, plaintiffs allege that Katherine Richardson "informed Defendant's agent . . . that Plaintiffs would be moving back into the Louisville Home in August 2021 as their primary residence" and that Amica "told Plaintiffs to just call and let Amica know when they were back in Colorado." *Id.* at 4, ¶¶ 26-27.  Additionally, plaintiffs allege that, after the fire, Amica informed them that Amica's "Denver branch was working toward writing a Homeowners Policy for [them] at the Colorado location."  *Id.* at 7, ¶ 51.  However, the plaintiffs' failure to allege that they actually requested a Homeowners Policy for the Louisville Home is fatal to their argument that the complaint alleges a special relationship with Amica based on a request for a specific type of coverage.

Second, plaintiffs argue that there was a special relationship between plaintiffs and Amica that began in 2018 when plaintiffs changed their primary residence from the Louisville Home to the Iowa Home.  Docket No. 16 at 8.  The complaint alleges that, on that occasion, Amica modified the insurance coverages for both homes without consulting plaintiffs or receiving express orders from them.  Docket No. 6 at 3-4, ¶¶ 17, 20-23.  As a result of this past experience, plaintiffs argue that Amica "lulled [plaintiffs] into believing that Amica would take care of their insurance needs as they moved back to Colorado, just as it had taken care of their insurance needs as they moved from Colorado to Iowa a few years prior."  Docket No. 16 at 8.  They base their argument that a course of prior conduct by an insurance company can give rise to a special relationship on *Estate of Hill v. Allstate Ins. Co,* 354 F. Supp. 2d 1192 (D. Colo. 2004) (applying Colorado law).  *Id.* at 8-9.  In that case, the court held that an insurance agent may be liable if, "in their prior dealings, the agent customarily took care of a customer's

8

insurance needs without consulting the insured and without further express orders from the insured, but the agent failed to do so in a particular instance." *Estate of Hill,* 354 F. Supp. 2d at 1197 (citing 4 Couch on Insurance § 46:46 (3rd ed.)). Plaintiffs argue that "[t]he pattern of Amica's conduct in 2018, as opposed to its conduct in 2021, plausibly gave rise to a legal duty under this legal theory." Docket No. 16 at 8.

Plaintiffs have not cited any case where a Colorado court found that an insurance agent had a duty to procure coverage for a customer on the basis of the agent's previous dealings with the customer, and the Court is aware of none. However, there are cases from other states that have recognized special relationships arising from defendants' prior dealings, but in those cases the defendants had taken care of the insureds' needs over many years without consulting them or obtaining express orders to do so. *See, e.g., Construction Planners, Inc. v. Dobax Ins. Agency, Inc.*, 583 N.E.2d 255, 257 (Mass. App. 1991) (holding that a jury could find prior dealings giving rise to a duty where plaintiff had relied on defendant for several years to meet its varied insurance needs, and defendant often renewed the policies automatically without consulting plaintiff); *Barnett v. Security Ins. Co. of Hartford*, 352 S.E.2d 855, 857 (N.C. App. 1987) (holding that evidence was sufficient for a jury to find prior dealings giving rise to a duty where defendant automatically renewed plaintiffs' multiple insurance policies when they expired over a period of three and a half years). The Court has found no case where a special duty arose from one instance of an insurance company issuing or renewing a policy without direction from the policyholder.

"[T]he general duty of [the insurer] to the insured is to refrain from affirmative fraud, not to watch out for all rights of the insured and inform the latter of them. Absent

9

a special relationship between the insured and [the insurer], an [insurer] has no duty to affirmatively advise or warn [a] customer of provisions contained in an insurance policy." *Estate of Hill*, 354 F. Supp. 2d at 1197 (quoting 4 Couch on Insurance § 55:5) (quotation marks omitted); *see also Kaercher,* 155 P.3d at 441 (holding that insurance agents "have no continuing duty to advise, guide, or direct a client to obtain additional coverage") (citation omitted).  The Court finds that plaintiffs have failed to allege circumstances giving rise to a special duty by Amica and therefore finds that plaintiffs have failed to plausibly allege a claim for negligence.  *See Whitlock,* 744 P.2d at 56.  Therefore, the Court will dismiss this claim.

### B.  Respondeat Superior

Amica seeks dismissal of plaintiffs' second claim on the basis that plaintiffs did not name any Amica agent or employee as a defendant.  Docket No. 14 at 7.  Plaintiffs do not oppose dismissal.  Docket No. 16 at 12.  Accordingly, the Court will dismiss this claim.

### C.  Breach of the Implied Duty of Good Faith and Fair Dealing

Under Colorado law, an insurer has a duty "to deal in good faith with an insured." *Decker v. Browning-Ferris Indus. of Colo.*, 931 P.2d 436, 443 (Colo. 1997) (citing *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1141-42 (Colo. 1984)).  "To state a common law insurance bad faith claim, the insured must allege facts demonstrating 'that (1) the insurer's conduct was unreasonable, and (2) the insurer either had knowledge of or reckless disregard for the fact that its conduct was unreasonable.'" *Ryals v. Am. Family Ins. Co., S.I.,* No. 20-cv-002736-NYW, 2021 WL 848195, at *6 (D. Colo. Mar. 5, 2021) (quoting *Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 970

(Colo. App. 2011)) (applying Colorado law).  In addition, "proof of actual damages is an essential element of a bad faith breach of an insurance contract claim."  *Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 121 (Colo. 2010).

In their third claim, plaintiffs allege that the allegations that form the basis of their negligence claim—Amica's failure to change the coverage on the Louisville Home from a Dwelling Policy to a Homeowners Policy—constitute common law bad faith.  Docket No. 6 at 10-12, ¶¶ 80-85, 88, 89b-c, 89e.  However, as discussed above, plaintiffs failed to allege that Amica had a duty to change the coverage on the Louisville home.  Accordingly, plaintiffs have not plausibly alleged that Amica acted unreasonably when it failed to do so and have therefore failed to state a claim for common law bad faith on this ground.  *See Nunn*, 244 P.3d at 121.

Plaintiffs' allegations that Amica (1) "repeatedly mixed up the Iowa Home and the Louisville Home in various communications with Plaintiffs" and (2) "[r]epeatedly fail[ed] to update the Louisville Home to Plaintiff's primary residence,"[4] Docket No. 6 at 11-12, ¶¶ 86, 89d, appear to be related to their allegations that Amica did not change the insurance policy on the Louisville Home from a Dwelling Policy to a Homeowners Policy.  However, to the extent that these allegations are separate from the allegations concerning Amica's failure to procure adequate insurance coverage for the Louisville Home, they are still insufficient to state a claim for common law bad faith.

---

[4] Plaintiffs claim that Amica "[f]ail[ed] to give equal consideration to Plaintiffs' interests," Docket No. 6 at 11, ¶ 89a, but this allegation is a legal conclusion which the Court will not consider for purposes of ruling on the motion to dismiss.  *See Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

11

Plaintiffs allege that Amica applied an endorsement and discount to the Iowa Home that should have been applied to the Louisville Home and that, after the fire destroyed the Louisville Home, Amica informed plaintiffs that they would receive a check for "necessary expenses" only to notify them an hour later that the first communication was inaccurate and had been based on Amica's mistaken belief that it was the Iowa Home that had burned down.  *Id.* at 5-6, ¶¶ 31, 42-43.  In addition, plaintiffs allege that the Amica policy covering the Louisville Home at the time of the fire indicated that the Louisville Home was not a primary residence, that in January 2022 Amica agreed to amend the policy's occupancy status, effective October 2021, but only changed the mailing address on the declarations page of the policy without making any "substantive changes,"[5] and that, as late as March 2022, Amica continued to issue documents for the Iowa Home that stated that the Louisville Home was a rental property.  *Id.* at 4, 6-7, ¶¶ 26-28, 45-47, 49.

Plaintiffs fail to allege that any of these actions by Amica resulted in damages.[6] Because "proof of actual damages is an essential element of a bad faith breach of an insurance contract claim," *Nunn*, 244 P.3d at 121, plaintiffs' failure to allege damages resulting from Amica mixing up the homes and failing to update the Louisville Home to

---

[5] It is not clear from the complaint whether the allegation that Amica "made no substantive changes" means that Amica did not change the occupancy status of the Louisville Home or that Amica did not change the insurance coverage of the Louisville Home.  Docket No. 6 at 6-7, ¶¶ 46-47.  However, the Court will interpret this allegation to mean that Amica did not change the occupancy status to show that the Louisville Home was a primary residence.

[6] Plaintiffs allege that in January 2022, the Federal Emergency Management Agency informed them that they did not qualify for relief after the fire because the Amica policy covering the Louisville Home indicated that it was not a primary residence.  Docket No. 6 at 6, ¶ 45.  However, they do not allege that they suffered any damages as a result.

plaintiffs' primary residence is fatal to the remaining portion of plaintiffs' bad faith claim. Accordingly, plaintiffs have not plausibly alleged that Amica breached its common law duty of good faith and fair dealing. The Court will dismiss plaintiffs' third cause of action.

## V. CONCLUSION

Therefore, it is

**ORDERED** that Defendant's Rule 12(b)(6) Motion to Dismiss [Docket No. 14] is **GRANTED.** It is further

**ORDERED** that plaintiffs' first and second causes of action are **DISMISSED with prejudice**. It is further

**ORDERED** that plaintiffs' third cause of action is **DISMISSED without prejudice**. It is further

**ORDERED** that plaintiffs are granted leave to file an amended complaint concerning their third claim on or before **October 12, 2023**.

DATED September 22, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge